IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WENDY ANDERSON HALPERIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2020 CV 07616 |
| | ) | |
| DRAWN TO DISCOVER, LLC, an | ) | Hon. Harry D. Leinenweber |
| Illinois Limited Liability Company, and | ) | |
| BRIAN T. GOODMAN, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON COUNT I**

### Introduction

Plaintiff Wendy Anderson Halperin brought a two count Complaint seeking a declaration that she is the sole and exclusive owner of the copyrights to video lessons she authored for distribution on the internet by Drawn to Discover ("DTD") (the "Video Lessons"), the now defunct limited liability company that she formed with Brian Goodman ("Goodman") and Samir Patel ("Patel").[1] Because there is no genuine issue that Halperin is the sole author and sole owner of the copyrights to the Video Lessons, this Court should enter summary judgment in her favor on Count I.[2]

### Statement of Facts

---

[1] Halperin filed an action for dissolution in state court against DTD and its members. Case No. 2020 CH 4120. Patel and all other named members of DTD, except Goodman, settled that action in 2020 and entered into a Settlement, Release and Confidentiality Agreement with Halperin in which they waived all membership interests and rights relating to DTD in exchange for being dismissed from the action. Halperin voluntarily dismissed that action when it became apparent that the ownership of the video lessons and the copyrights to those lessons was the pre-dominant issue.

[2] Count II seeks a judgment dissolving DTD and authorizing notice and winding up of the business. Judgment with respect to the issues in Count II is not sought at this time.

Plaintiff Wendy Anderson Halperin ("Halperin"), also known as "Miss Wendy", has spent most of her adult life drawing children and teaching them to draw. (Fact No. 1)[3] She spent 25 years in school assemblies observing and drawing children for the children's books she illustrated and that were published by major publishing companies. (Fact No. 2)

During that time, she observed that the children had poor handwriting and were lacking in fine motor skills. (Fact No. 3) Her observations led her to create drawing lessons designed to improve these skills and improve handwriting and literacy, starting with the proper way to hold a pencil and then how to draw using the proper pencil grip. (Fact No. 4)

For more than 15 years --from 2008 to date -- Halperin has single-handedly authored hundreds of drawing lessons for pre-school age and kindergarten through first grade children and has developed, marketed and sold curriculum and teaching manuals based on these materials to a number of school districts in California, Michigan and Illinois. (Fact Nos. 1,5) In 2015, Halperin established Drawing Children Into Reading ("DCIR"), as a not-for-profit, to support her literacy program. (Fact No. 6)

Initially, Halperin visited schools personally to teach children to draw and to educate teachers and administrators on how to use her drawing lessons. (Fact No. 7) Later she created and provided schools with video recordings that incorporated her drawing lessons. All of this work was created by Halperin alone. (Fact No. 8) By 2016, Halperin had created more than 1,000 separate lessons for children in preschool through second grade and had plans for expanding her program by creating additional drawing lessons for children in third grade and above. (Fact No. 8)

---

[3] "Fact No. ___" refers to the paragraphs in Plaintiff's Rule 56.1 Statement of Material Facts.

Defendant Goodman met Halperin in the summer of 2016 when he rented Halperin's home in Michigan for a family vacation. Halperin introduced Goodman and his young son to her drawing program and gave DVDs of her kindergarten drawing lessons to Goodman to take home for his son. (Fact No.9)

Goodman was so impressed with his son's response to the video lessons Halperin had created that, shortly after his visit, he wrote Halperin to propose a business venture based on the lessons Halperin had created. Goodman proposed to Halperin that she license her "awesome," "magical program" and turn it into "an online individual subscription service." Goodman went on to describe his proposal to start a for-profit business and market Halperin's program to families to increase Halperin's "impact and footprint with children around the country" and generate revenue for Halperin's not-for profit:

> So this brings me to my final question. I know your passion for DCIR is to connect with teachers nationwide and promote the program to be utilized in classrooms. My question is, would you ever consider licensing the program and turn it into an online individual subscription service?
>
> Online and social marketing is what I do for a living....I believe a consumer/parent/child focused program like this could be a wonderful way to grow your impact and footprint with children across the country.
>
> My good friend, Samir Patel, is my "entrepreneurial partner" whom I work with to create different ideas and products. Our goal is to deliver products that drive positive resonance to consumers....
>
> Sam and I would love to "mock" up a video membership/subscription site for you to consider. We believe we could drive amazing support to your non-for-profit through a for-profit platform that engages individual families. The revenue we generate could then help you support your mission of getting the program in front of more and more teachers and schools across the country. (Fact Nos. 9, 11)

At the time he met Halperin, Goodman was employed by Revolt Media, a digital platform for news and entertainment, as Vice-President of Sales and Marketing. (Fact No. 10)

3

Goodman had no prior experience in starting a business or in the field of education. (Fact No. 10)

Goodman's proposal to form a for-profit business venture that would generate income to help support DCIR's mission appealed to Halperin. (Fact No. 34) Goodman brought in his "business partner" Samir Patel and together with Halperin formed Drawn to Discover, LLC ("DTD"). Halperin was to provide the content of the video lessons, Patel to develop the platform -- that is, the website, and technological support systems that were needed to make the videos available on the internet -- and Goodman to oversee marketing and the company's financing. (Fact Nos. 9, 11, 12)

Goodman prepared an Operating Agreement for an Illinois Limited Liability Company with Halperin and Goodsami, LLC, Goodman's and Patel's joint venture, as members, with each owning 50% of the company, and as co-managers. This agreement was the only document, relating to the governance of the company and the respective rights of the parties that Halperin, Goodman and Patel signed. The Operating Agreement made no reference to the Video Lessons that Halperin created and refilmed for DTD's use or ownership of the copyrights to the video lessons. (Fact No.13)[4]

Halperin initially planned to use the videos that she had created for DCIR beginning in 2006. In light of technological advancements, Halperin, Goodman and Patel agreed that Halperin would refilm the video lessons to improve the audio and video quality. (Fact No. 14) Goodman recruited Amador Valenzuela, a technician with experience in video production whom he knew,

---

[4] The joint venture, Goodsami, LLC, never made money or developed other businesses and subsequently ended. (Fact No. 35) The Operating Agreement was amended to show that Goodman and Patel each owned units in his own name. The Operating Agreement was amended several more times, but none of these changes referred to ownership of the video lessons or copyrights. (Fact No.13)

4

to assist in setting up a new camera, lighting and sound equipment at Halperin's studio in Michigan. (Fact No.15)

In September 2016, Halperin began refilming video lessons from the library of more than 1,000 video lessons she had created for DCIR. In refilming, Halperin recreated the subject of each lesson that she had previously filmed—for example, a pencil, mouse, cupcake, honey bee, the sun -- based on her years of drawing and continuing research. (Fact Nos.16, 17) She narrated each video lesson as she filmed it, explaining what she was drawing and how to draw each element step by step so that a teacher, parent or child could follow along. All of the videos were filmed in Halperin's studio, and no one other than Halperin participated in the filming process. (Fact Nos.21, 22)

Once Halperin completed her lessons, she forwarded the video to Patel, /Goodman, and Valenzuela at DTD in Illinois. Halperin also sent along her editing notes to the video lessons – for example to eliminate background noise or interruptions. (Fact No.18) Goodman and Patel recruited freelance editors who performed the routine editing work to create a production quality video, but no lesson content was added to the video lessons – nor was any change to content made -- after Halperin forwarded the videos. (Fact Nos. 16, 17, 21) Valenzuela added an intro and outro to each lesson. The intro was a five second sequence of musical notes that served as background to a picture of crayons spilling from a box, and the outro was another five second sequence of musical notes that served as background to an animated "Thank you". The same "intro" and "outro" was used for each video lesson, but they were never a part of the lesson and they were added as a marketing tool designed to get the attention of the audience. (Fact No.19)

By mid-2019, Halperin had filmed and delivered to DTD more than 700 video lessons, 547 of which were edited and uploaded to the DTD website. Halperin continued refilming video lessons and creating new video lessons throughout the remainder of 2019. (Fact No. 20) As

5

Goodman had acknowledged a year earlier, the biggest concern with a start-up is content, "and content was easy." Halperin "just cranked out video after video after video…. It was just about her. She's a machine." (Fact No. 22)

By Fall 2019, the for-profit business had run out of money. (Fact No. 23) In the spring of 2019, Goodman had identified a potential investor in National Wine & Spirits, Inc. ("NWS"). (Fact No. 24) NWS, however, quickly recognized that DTD's only marketable assets were Halperin's video lessons. (Fact No. 25)[5]

When NWS learned that Halperin had not previously assigned her copyrights to DTD and that she claimed ownership of them, NWS made clear that they would not invest in DTD unless Halperin executed appropriate documents assigning her intellectual property rights to DTD. (Fact No. 27) Halperin objected and never agreed to assign her copyrights to DTD but proposed a Licensing Agreement. (Fact Nos.30, 32) She also objected to Goodman's proposal to amend the Operating Agreement to reduce the percentage of votes required to approve corporate decisions from unanimous to 51%, a change that would mean that Halperin could lose control over DTD's business decisions concerning the marketing and use of her video lessons, including on DTD's website. (Fact No. 31)[6]

In early 2020, Goodman took down DTD's website and did not renew its corporate registration. (Fact No. 28) DTD was not dissolved because the members did not reach

---

[5] In July 2019, Halperin had advised Goodman that she "would need to protect the copyright of the contents of the videos if we get into an investment arrangement with NWS…I will not agree to anything that does not protect my artwork/lessons." (Fact No. 26)

[6] In the course of negotiations with NWS, Goodman had engaged an attorney to, among other things, opine that "all the educational content currently available on the DTD website" were joint works under the copyright laws. The attorney sent an opinion letter to Halperin on behalf of DTD's members asserting that position. Goodman disavowed that position at his deposition, testifying that he had not accepted the lawyers' conclusion and believed then and still does that everything was owned by DTD. (Fact No. 29)

6

agreement on the ownership of the video lessons and terms of dissolution or winding up of the company.

## This Court Should Grant Summary Judgment on Count I

### I. Standard for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is appropriate where "there is no genuine issue as to any material fact and…the moving party is entitled to judgment as a matter of law." The moving party has the initial burden to identify those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party then has the burden of setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56c. Rule 56c thus "mandates the entry of summary judgment… against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex* at 322.

Although the court must construe all facts and inferences in the light most favorable to the nonmoving party, drawing inferences supported only by speculation or conjecture or creating some metaphysical doubt as to the material facts. The mere existence of a scintilla of evidence in support of the [non-moving party's] positions will be insufficient." *Anderson v. Liberty Lobby, Inc,.* 477 U.S. 242, 252 (1986). The non-moving party must come forward with specific facts showing that there is sufficient evidence to permit a jury to return a verdict for that party. *Argyropoulos v. City of Alton,* 539 F.3d 724, 732 (7th Cir. 2008); *Woods v. Resnick*, 725 F. Supp. 2d 809, 817 (W.D. Wis. 2010); *Rubloff, Inc. v. Donahue*, 1994 U.S. Dist. LEXIS 4657 *4-

5 (N.D. Ill. April 1994)[7] Summary judgment is appropriate in this case. There is no genuine issue that Plaintiff is the sole author of the content of the Video Lessons she filmed for DTD's website and the sole owner of the copyrights to the content of those Video Lessons.[8]

### II. There is No Genuine Issue As to Halperin's Sole Ownership of the Copyrights to the Contents of the Video Lessons.

There is no genuine issue that Plaintiff authored and owned the rights to the original video lessons that had been made for DCIR and that DTD planned to use on its website. Goodman acknowledged this fact in September 2016 when he asked Halperin if she would be willing to license her video lessons for use on an online platform. On the website and in public statements, Defendants gave all the credit for the content of the videos they used on the DTD website to Halperin. (Fact Nos. 21, 23) The DTD website acknowledged Halperin as the author of the video lessons, stating that "Our video programs were developed by Wendy Anderson Halperin....Wendy shares her S.T.E.A.M. and literacy work she developed through her non-profit, Drawing Children into Reading," (Fact No. 39) As late as the summer of 2019, a white paper prepared jointly by Halperin and educator and DTD member, David Barrett, noted that Halperin's curriculum was now available for parents and teachers through an online platform, "*DrawntoDiscover.*" (Fact. No. 40) Neither the website nor the white paper credited anyone other than Halperin with contributing any content to the Video Lessons.

Nonetheless, Defendants have asserted copyright ownership based on the Video Lessons being joint works and, in the alternative, have claimed that all the content of the video lessons is

---

[7] Where both parties move for summary judgment, the court "evaluates each motion by construing the facts against the non-moving party." *Beasley v. Commonwealth Edison Co.*, 2013 U.S. Dist. LEXIS 122766 *14 (N.D. Ill. Aug. 28, 2013)

[8] Labeling the refilmed Video Lessons "derivative works" does not change the authorship of the videos or the fact that Halperin authored and owns the original and refilmed videos. 17 U.S.C. §101, §106 (owner of copyright has exclusive right to reproduce the copyrighted work in copies or prepare derivative works based upon the copyrighted work)

8

the property of DTD. (Fact No. 29) Neither claim has merit as a matter of law. The Video Lessons are not joint works; nor are they the property of DTD.

A. The Video Lessons Are Not a "Joint Work"

Section 101 of The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. In *Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994), the Seventh Circuit adopted the test enunciated by the Second Circuit in *Childress v. Taylor*, 945 F. 2d 500 (2nd Cir. 1991), holding that a joint authorship claimant must clear two hurdles to prevail:

> (a) The contribution of each joint author must be copyrightable; and
> (b) Each putative joint author must have intended to be a joint author at the time the work was created.

Neither Goodman nor DTD can clear either hurdle.

As to copyrightability, the *Erickson* court first considered and adopted the interpretation adopted by most courts that a "collaborative contribution will not produce a joint work, and a contributor will not obtain a co-ownership interest, unless the contribution represents original expression that could stand on its own as the subject matter of copyright." *Id.* at 1070 (quoting Paul Goldstein, *Copyright: Principles, Law, and Practice* §4.2.1.2, at 379 (1989) The court held:

> We agree that the language of the Act supports the adoption of a copyrightability requirement. § 101 of the Act defines a "joint work" as a "work prepared by two or more *authors*" (emphasis added). To qualify as an author, one must supply more than mere direction or ideas. An author is "the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 737, 109 S.Ct. 2166, 2171, 104 L.Ed.2d 811 (1989)

*Erickson,* at 1071.

*Erickson* involved a claim by the plaintiff playwright that Trinity Theatre had infringed her copyrights. Trinity claimed that the plays were joint works because Trinity actors had made

9

suggestions to and collaborated with the plaintiff on scripts for three plays. Although the actors had edited scenes and, in at least one case, had developed certain scenes and dialogue in collaboration with the plaintiff, and the plaintiff had attributed the script to that actor, the court rejected all claims because none of the contributions could have been independently copyrighted:

> In order for the plays to be joint works under the Act, Trinity also must show that actors' contributions to Ms. Erickson's work could have been independently copyrighted. Trinity cannot establish this requirement for any of the above works. The actors, on the whole, could not identify specific contributions that they had made to Ms. Erickson's works. Even when Michael Osborne was able to do so, the contributions that he identified were not independently copyrightable. Ideas, refinements, and suggestions, standing alone, are not the subjects of copyrights. *Id.* at 1072.

Goodman and DTD admit that Halperin created and filmed the Video Lessons that she forwarded to DTD and that the lessons were based on a curriculum Halperin had developed through her non-profit DCIR. DTD and Goodman claim to have "enhanced" the videos through editing and providing better equipment that resulted in technical improvements to the visual and sound quality of the videos. (Fact No. 29; PX26) Goodman and DTD have never identified a Video Lesson or drawing or character or story line in any video that they created or wrote; because they cannot; because they did not. Whatever the value of their contributions, and regardless of whether they label their contribution editing or enhancement, their edits and improvements were not copyrightable and therefore do not satisfy the first prong of the "joint works" test.[9]

The only other contribution to the Video Lessons that Goodman and DTD have identified are the animated five second arrangements of chords that accompany a picture of falling crayons and letters spelling out "Thank you" –the intro and outro that Valenzuela added before and after

---

[9] As Amador Valenzuela, the person primarily responsible for these improvements acknowledged, Halperin's "lessons were great, but the videos were not marketable". His job was to take the "great" videos that Wendy created and provide the equipment to improve their quality. (PX26).

10

each Video Lesson. (Fact No. 19). It is doubtful that these common chords and simple animation are sufficiently "creative" to be copyrightable:

> "copyright *does* require at least a modicum of creativity and does not protect every aspect of a work; ideas, concepts, and common elements are excluded. Nor does copyright extend to common or trite musical elements, or commonplace elements that are firmly rooted in the genre's tradition. These building blocks belong in the public domain and cannot be exclusively appropriated by any particular author." *Skidmore*, 952 F.3d at 1069

*Gray v. Hudson*, 28 F.4th 87, 97 (9th Cir. 2022) Copyrightability is a question of law for the court. *Woods v. Resnick, supra,* 725 F.Supp.2d at 817, and cases cited. This Court should therefore grant summary judgment for Halperin on Count I.

Neither the chords and animation that Valenzuela added nor the editing that was done after Halperin sent her films to DTD satisfies the second requirement of a joint work, namely that at the time the work was created, each author "intended to be joint authors" and "intend that their respective contributions be merged into a unitary whole." *Erickson, supra,* at 1068-69, 1071. The intro and outro were clearly not intended to be merged into the video lessons to be inseparable or interdependent parts of a unitary whole any more than a picture frame or an introduction to a book. *Rubloff, Inc. v. Donahue*, 1994 U.S. Dist. LEXIS 4657*15 (N.D. Ill. Apr. 13, 1994) ("Inconceivable" that a person who writes a preface or introduction to another author's work can "legitimately" claim to be a joint author of the work). Valenzuela did not make such a claim.[10] At the time that she learned about the intro and outro, Halperin certainly did not intend that they be made a part of the video lessons (Fact No.37), and there is no document or other evidence that anyone suggested that they were.

---

[10]Valenzuela is not a party to this case and has released all claims against Halperin. As discussed below, DTD has no basis to claim it is a joint author because of any contributions Valenzuela made.

11

Nor do the contributions of other members of DTD or third-party editors meet the requisite intent to be merged into a unitary whole. Relying on the statutory language that requires that there be "an intent to create a joint work," the *Erickson* court rejected the notion that "collaboration" would be sufficient to convey joint author status:

> Focusing solely upon the fact of contemporaneous input by several parties does not satisfy the statutory requirement that the parties intend to merge their contributions into a unified work …. Seldom would an author subject his work to preregistration peer review if … [collaboration alone] were the applicable test. Those seeking copyrights would not seek further refinement that colleagues may offer if they risked losing their sole authorship. Thus, we cannot accept Trinity's proposed [collaboration alone] test as compatible with the language and purpose of the Act. *Id.*at 1069 (Citation omitted)

The *Childress* court pointed to the relationship between author and editor as one that neither an author nor an editor would expect to result in joint authorship, and the editor's enjoying a half interest in the copyright in the works. *Childress v. Taylor, supra* at 507; *Rubloff, Inc. v. Donahue, supra*, at *13   In *Childres*s, the court cautioned that:

> Focusing on whether the joint authors regarded themselves as joint authors is especially important in circumstances such as the instant case, where one person…is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another…are joint authors. *Id.* at 508.

That caution is plainly applicable here. As the *Childress* and *Erickson* courts suggested, a useful test for intent would be whether each participant intended that all would be identified as co-authors and whether they were all given billing or credit as being authors. *Childress,* at 508; *Erickso*n, at 1072.[11]  No other member of DTD was accorded credit as an author or contributor to

---

[11] See *Janky v. Lake County Convention Visitors Bureau*, 576, F.3d, 356, 362 (7th Cir. 2009), where the court concluded that the two parties intended to be joint authors at the time the work was created based on Faraj's control over the content of the lyrics but, more important, based on the plaintiff's copyright registration form that identified the putative joint author as a "coauthor" and the song as a "joint work".

the video lessons, either on the website or in interviews or press reports or any contemporaneous document describing the program. This is not surprising since Halperin considered herself the sole author, and no other DTD member suggested that this was not the case. It is unimaginable that Halperin, after twenty-five years developing her skills and observing children in classrooms and ten years developing curriculum and authoring drawing lessons for young school children would simply agree to share the accumulated work reflected in the 700 videos she delivered to DTD equally with the other members of DTD. Defendants have pointed to no document that suggests Halperin intended to do so. And the Operating Agreement, the only written agreement between the parties, never mentions a copyright, the Video Lessons or Halperin's work product.

B.  **DTD Does Not Own the Video Lessons.**

Goodman claims that DTD owns the Video Lessons that Halperin filmed as well as "everything else" that goes with them. (Fact No. 29) This claim ignores the U.S. Copyright Act and established case law. Under the Act, the "author of the work owns the copyright to the work. 17 U.S.C. §201. Generally, the "author" is the person who creates the work. That person is Halperin. An exception to this rule are "works made for hire," in which case the person who hires the work's creator is the "author." Works made for hire are limited to a work prepared by an employee within the scope of his or her employment or a work specially ordered, but only if "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. §101.

In this case, there is no written agreement relating to the Video Lessons; nor was Halperin ever an employee of DTD. In *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989), the Supreme Court held that the term: "employee" is to be understood in light of common law principles of agency law, rather than the law of any state, and set out certain factors to be considered, including:

the skill required … the location of the work … whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants …the provision of employee benefits; and the tax treatment of the hired party. *Id*. (footnotes omitted)(citing Restatement (Second) of Agency § 220(2) (1958)).

None of these factors apply to Halperin's relationship to DTD. Halperin was a co-owner of DTD, not an employee. She worked in her own studio, under her own terms, paid her own expenses and was not paid a salary or provided benefits by DTD. As the court explained in *Woods* v. *Resnick,* 725 F.Supp. 2d at 824:

> [A]s a co-owner of the company, Woods does not have an agency relationship with F&I Source. Unlike an employee or independent contractor, an owner has an inherent right to control the business. "[T]he attribute of co-ownership distinguishes a partnership from a mere agency relationship. . . . Ownership involves the power of ultimate control." Rev. Unif. Partnership Act § 202(a), cmt. (1997) (citing Unif. Partnership Act § 6(1) cmt.)). See also *Smith v. Castaways Family Diner*, 453 F.3d 971, 980 (7th Cir. 2006) ("The owner of a business, even if he chooses not to exercise it, always has the right to control the direction and operation of the business.").

DTD's Operating Agreement, Article 4.1 B, required that all members agree to any corporate action. Moreover, initially there were only two members, each holding 50% control, so unanimity was required. (Fact No. 13) DTD did not have the ability to compel Goodsami or Halperin to take action. As in *Woods*, there is no basis for finding that Halperin was an employee under DTD's control, and no basis for DTD's claiming ownership of the Video Lessons Halperin authored.

## **CONCLUSION**

For the reasons set forth above, this Court should grant Halperin's Motion for Summary Judgment on Count I of her Complaint.

Respectfully submitted,

/s/ Terry Rose Saunders
Terry Rose Saunders
The Saunders Law Firm
120 North LaSalle Street
Chicago, IL 60602
(312) 444-9656
tsaunders@saunders-lawfirm.com

/s/ Patrick D. Lamb
Patrick D. Lamb
Plunkett Cooney PC
221 North LaSalle Street
Suite 3500
Chicago, Illinois 60601
312-670-6900
plamb@plunkettcooney.com
*Attorneys for Plaintiff*

Date: June 22, 2023